IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KEVIN BROOKS, | ) | Case No. 1:22-CV-01904 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

Plaintiff, Kevin Brooks, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  Brooks challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ erred in finding, at Step Three, that he did not have marked limitations in his ability to concentrate, persist, or maintain pace.  Although the ALJ's statement of his reasoning left much to be desired, because the ALJ's finding was supported by substantial evidence, the Commissioner's final decision denying Brooks's application for SSI must be affirmed.

## I.      Procedural History

Brooks applied for SSI on February 24, 2021.  (Tr. 174).[1]  Brooks alleged that he became disabled on December 15, 2017, due to his mental health.  (Tr. 200, 204).  The Social Security

---

[1] The administrative transcript appears in ECF Doc. 7.

Administration denied Brooks's application initially and upon reconsideration.  (Tr. 62-69, 72-78).  Brooks requested an administrative hearing.  (Tr. 99).

On October 13, 2021, ALJ William Leland held a telephonic administrative hearing and denied Brooks's application in an October 21, 2021 decision.  (Tr. 15-27, 33-61).  In so ruling, the ALJ determined that Brooks had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, except:

> [Brooks] can never climb ladders, ropes, or scaffolds.  He can never be exposed to unprotected heights, moving mechanical parts, or operate a motor vehicle.  He has the ability to understand, remember, apply information, concentrate, persist, and maintain pace to perform simple, routine, and repetitive tasks, but not at a production rate pace (i.e., assembly line work).  He is limited to simple work related decisions in using his judgment and dealing with changes in the work setting.  He is able to occasionally interact with supervisors and coworkers.  He can never interact with the public.

(Tr. 19-20).  On August 29, 2022, the Appeals Council declined further review, rendering the ALJ's decision the Commissioner's final decision.  (Tr. 1-3).  On October 24, 2022, Brooks filed a complaint to obtain judicial review.  ECF Doc. 1.[2]

## II.     Evidence

### A.     Personal, Educational, and Vocational Evidence

Brooks was born on December 24, 1973, and was 43 years old on the alleged onset day.  (Tr. 200).  He completed the tenth grade and had previously worked in a factory, which the ALJ determined he would not be able to perform.  (Tr. 25, 204-205).

### B.     Relevant Medical Evidence

Brooks's challenge to the ALJ's decision is limited to his mental health impairments; thus, it is only necessary to summarize the evidence related to his mental health.  *See generally* ECF Doc. 8.

---

[2] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

On February 11, 2021, Brooks saw Jodie Fine, LPCC-S, at the Nord Center to complete an initial psychotherapy assessment.  (Tr. 247-257).  Brooks reported having a depressed mood, anxiety, insomnia, a fear of dying home alone, and using alcohol to sleep.  (Tr. 247).  He indicated that his brother lived downstairs from him, his other siblings lived out of town, his mother was murdered when he was 17, and his father died when he was 19.  (Tr. 248).  Brooks reported that he "keep[s] getting up and keep[s] trying," but "there is nothing that [he] like[s] to do."  *Id.*  Regarding his schooling, he reported finishing tenth grade, having difficulties reading and writing, but generally being a good student, earning B's.  *Id.*  He was currently unemployed and had struggled with his job attendance after separating from his wife.  *Id.*  Brooks reported that he had previously been hospitalized to detox from his alcohol use, and had previously been diagnosed with the following: adjustment disorder with depressed mood, other specified mental disorder, unspecified alcohol related disorder, alcohol intoxication, "Depressive Disorder NOS," alcohol abuse, cannabis use, antisocial personality, and other impulse control disorder.  (Tr. 249).  Brooks indicated he used alcohol on a daily basis, usually drinking 3 or 4 beers, and that he smoked marijuana less than once a month.  (Tr. 250).

Fine noted that Brooks was limited in his daily activities, specifically in his personal hygiene and grooming, basic communication skills, and completing housework, lacking energy and motivation.  (Tr. 251).  Fine also noted that Brooks had a decreased appetite since his separation, difficulty falling or remaining a sleep, and experienced a depressed mood, anhedonia, and fatigue.  *Id.*  Fine reported that Brooks had impaired concentration and insomnia, and had been sober for three years, prior to his separation.  (Tr. 251-252)*.*  Brooks stated that he drinks "whenever [he] can get it."  (Tr. 252).  He reported previously experiencing the desire to be dead, and non-specific suicidal thoughts and ideations, but not within the last 30 days.  *Id.*

Fine indicated that Brooks exhibited the following anxiety symptoms: worry, restlessness, fatigue, irritability, and muscle tension.  *Id.*  She noted that Brooks had excessive anxiety "that is difficult to control."  *Id.*  Brooks reported impaired concentration, having been present when his mother was murdered, and violent relationships with women.  *Id.*  Brooks also reported having nightmares, intrusive thoughts, psychological response to triggers, blocked memories, hypervigilance, exaggerated startle response, detachment from others, difficulty trusting others, irritability, insomnia, impaired concentration, decreased interest in activities, and that he avoided thinking about traumas.  *Id.*  Fine noted that Brooks had a history of verbal and physical aggression, and acted out when angered without considering the consequences, violating rules and being argumentative and impulsive.  (Tr. 252-253).

Fine noted that Brooks had psychological stressors from his separation and impending divorce and worries over his mental health, physical health, finances, and living alone.  (Tr. 253).  Fine conducted a mental status exam, and observed that Brooks was fully oriented and had pressured speech; goal-directed thought content; a tangential thought processes; a moderate, irritable mood; a moderate, constricted affect; resistant, agitated, but cooperative behavior; cognitive impairments in his memory and attention/concentration; average intelligence; fair insight; and poor judgment.  (Tr. 254).  She noted Brooks's participation was variable and that he was defensive about his alcohol use.  *Id.*  Fine recommended that Brooks receive services to increase his independence, evaluate and manage his medications, assist him in processing significant life events, and assist him in improving his interpersonal skills.  (Tr. 255).

On February 22, 2021, Brooks saw Anansa Hinton, QMHS, for therapy.  (Tr. 262-263).  Hinton indicated Brooks was fully oriented and had an anxious, irritable mood; "petrified" behavior; and logical thought process.  (Tr. 262).  Brooks discussed his divorce and how it

triggered mental health symptoms and alcohol consumption. *Id.* Brooks also reported an interest in counseling and rehabilitation for his alcohol use. *Id.*

On March 8, 2021, Brooks saw Kimberly Gilbert, MSN, APRN, PMHNP-BC, for psychiatric therapy. (Tr. 259-261). Gilbert noted Brooks's prior diagnoses of persistent depressive disorder, generalized anxiety disorder ("GAD"), post-traumatic stress disorder ("PTSD"), and unspecified alcohol-related disorder. (Tr. 259). Brooks reported that he had experienced "progressively worsening mood symptoms" over the past four years, since separating from his wife, but he also experienced depression and anxiety symptoms before the separation. *Id.* Those symptoms included self-isolation, tearfulness, anxiety, agitation, feelings of guilt, worthlessness, hopelessness, anhedonia, forgetfulness, and poor memory/concentration. *Id.* Brooks reported that his mood was 2/10. *Id.* Gilbert noted that Brooks reported a history of expansive mood symptoms, including pressured speech, impulsivity, racing thoughts, episodes of extreme agitation/rage, and excessive spending, which would last for undetermined amounts of time. *Id.* Brooks's last manic episode was a few years prior, but he also reported paranoid thoughts of being "watched, harmed." *Id.* Gilbert noted that Brooks described psychosis symptoms that typically occurred in conjunction with prominent mood symptoms, such as poor memory, difficulty understanding some questions, and slow processing. *Id.* Gilbert indicated Brooks was a poor historian and he had mild and primary insomnia symptoms. *Id.* He was receptive, fearful, and paranoid about medications, but was willing to start that day. *Id.*

Gilbert's review of Brooks's systems was, generally, normal. *Id.* She noted Brooks drank about four beers between the night prior and that morning and had been admitted to the hospital multiple times related to his drinking, with the last being about two years prior. *Id.* In a mental status examination, Gilbert noted that Brooks was expressive and fully oriented, and had

a logical, racing thought process; clear speech; paranoid thoughts; distracted

attention/concentration with some developmental delays and issues comprehending questions;

intact associations; poor memory; poor insight/judgment; a depressed and irritable mood; full

affect; and limited fund of knowledge.  (Tr. 259-260).  Gilbert started Brooks on Seroquel for his

bipolar depression, psychosis, agitation, anxiety, and insomnia.  (Tr. 260).

On March 15 and 24, 2021, Brooks saw Hinton for therapy.  (Tr. 264-265, 279-280).  In

both sessions, Hinton noted that Brooks was fully oriented, had a stressed/euthymic mood, was

pleasant or cooperative, and had logical thought processes.  (Tr. 264, 279).  During his March 15

session, Brooks reported feeling stressed, increasing his alcohol consumption, having no income,

and feared he would lose his home.  (Tr. 264).  But he felt "alright" in his latter session and had

contacted services for his alcohol use.  (Tr. 279).

On April 5, 2021, Brooks met with Gilbert.  (Tr. 274-275).  Brooks reported that he had

not started his medication and struggled with racing thoughts, anxiety, and depression symptoms.

(Tr. 274).  A review of his systems was unremarkable.  *Id.*  Gilbert conducted a mental status

examination, and observed that Brooks was expressive and fully oriented, and had racing

thoughts, clear speech, no abnormal thought content, some developmental delays and slow

processing, intact associations, poor memory, poor insight, an anxious and dysphoric mood, and

a poor fund of knowledge.  (Tr. 274-275).  Gilbert instructed Brooks to start his medication and

recommended psychotherapy.  (Tr. 275).

On April 14, 2021, Brooks was admitted to the emergency room at Mercy Hospital,

complaining of a panic attack.  (Tr. 330-331).  Brooks noted his drinking problem, anxiety, and

that he could not take his medication while drinking, so he came to the hospital to detox.

(Tr. 331).  A review of Brooks's systems and physical examination results were unremarkable.

(Tr. 331, 334).  On reevaluation, Brooks did not want help detoxing and was discharged.
(Tr. 336).

On April 20, 2021, Brooks saw Hinton for therapy.  (Tr. 281-282).  Hinton noted that
Brooks was fully oriented and cooperative, and had an anxious mood and logical thought
process.  (Tr. 281).  Hinton noted that Brooks's symptoms had not improved.  *Id.*  Brooks
reported increased depression and anxiety, which Hinton observed could be attributed to his
psychological stressors.  *Id.*  Brooks also noted that he attended a service for detoxing, but he did
not believe it worked.  *Id.*  Brooks feared he would lose his home due to his alcohol use.  *Id.*

On April 26, 2021, Brooks was again seen at the emergency room, complaining of
alcohol intoxication, specifically alcohol withdrawal and anxiety.  (Tr. 356).  A review of his
systems was positive for agitation, but he was otherwise normal.  (Tr. 357).  On physical
examination, he was noted as not being diaphoretic, and was otherwise unremarkable.
(Tr. 359-360).  It was noted that there were no symptoms or physical findings of alcohol
withdrawal, and he was discharged in good condition.  (Tr. 361).

On April 28, 2021, Brooks was seen at the emergency room for a panic attack,
depression, and alcohol intoxication.  (Tr. 364-365).  Brooks reported that he wanted help for his
drinking and psychiatric concerns, noting he drank about three or four 24 oz cans of beer a day.
(Tr. 365).  A review of Brooks's systems was unremarkable except for his dysphoric mood and
his nervousness/anxiety.  *Id.*  Brooks's physical examination results were unremarkable.
(Tr. 368-369).  The final impression was that Brooks had acute alcohol intoxication and anxiety,
and he was discharged.  (Tr. 371).

On May 15, 2021, Brooks was seen again at the emergency room for alcohol problems.
(Tr. 385).  Brooks reported experiencing alcohol withdrawal symptoms, including a single

episode of vomiting, which was black in color.  (Tr. 386).  He indicated his symptoms were mild

to moderate in severity, with nothing making them better or worse.  *Id.*  A review of Brooks's

systems indicated he had nausea and vomiting.  *Id.*  His physical examination results were

unremarkable.  (Tr. 389).  After a few hours of monitoring, Brooks was discharged.  (Tr. 391).

On June 21, 2021, Brooks saw Gilbert, who noted that Brooks's mood was fluctuating

between depression, agitation, anxiety, and paranoia.  (Tr. 283, 312).[3]  Brooks reported he did

not consistently take his mood stabilizer due to his paranoid thoughts and he was drinking 24 oz

cans of beer four times a day.  (Tr. 312).  Gilbert observed that Brooks was fully oriented,

expressive, easily confused, and distracted, and had a logical and racing thought process, clear

speech paranoid thoughts, intact associations, poor memory, poor insight, poor medication

compliance, limited fund of knowledge, and a depressed, anxious, irritable, mixed mood and full

affect.  (Tr. 312-313).  Gilbert increased Brooks's medication and noted that his progress was

deteriorating.  (Tr. 313).

On July 29, 2021, Brooks saw Baily Brimus, LSW, for psychotherapy.  (Tr. 284).

Brimus noted that Brooks's mood was depressed, he had a flat affect, and he had a tangential

thought process, but he was otherwise unremarkable in his mental status.  (Tr. 285).  Brooks

reported that he experienced racing thoughts, sleep disturbances, and used unhealthy coping

mechanisms, such as alcohol, to help with his depression and anxiety.  (Tr. 286).  Brimus

reported that Brooks felt he could not be away from individuals who consumed alcohol due to

"going crazy" when alone, and noted he displayed blocked thinking.  *Id.*

On August 13, 2021, Brooks saw Bradley Gabriele, QMHS, for therapy.  (Tr. 287-290).

Gabriele noted that Brooks had a loose, blocked thought process; was pleasant, cooperative, and

---

[3] The substance of the medical record is undated; however, the lone evaluation and management record
(Tr. 283) appears to fit with the substance of the record.

had restless behavior/functioning. (Tr. 288). Brooks spoke of having a bad memory and feeling overwhelmed. (Tr. 289). Brooks drank beer during the appointment, but Gabriele noted he did not appear visibly intoxicated. *Id.* Brooks paced during the entire session and spoke of attending rehab after getting his physical health "on track." *Id.*

On August 13 and 31, Brooks saw Brimus. (Tr. 291, 300). Brimus observed that Brooks had a depressed or anxious mood, blocked thought process, and either continued to rely on alcohol for coping or exhibited tangential behavior. (Tr. 292, 300). During his August 13 session, Brooks reported that he had not been feeling well, due to racing thoughts, and he attempted to stay positive but continued to use alcohol. (Tr. 293). He could not identify the triggers for his alcohol use and was confused over the treatment team members' roles. *Id.* Brooks later reported continued racing thoughts, as well as stress, anxiety, sleep disturbances, daily alcohol use, and needed "to pinch himself in order to feel real." (Tr. 302). Brooks noted he wanted to process the grief associated with the loss of family members. *Id.*

On September 1, 2021, Brooks saw Gabriele. (Tr. 303). Gabriele noted that Brooks had a full affect, logical thought process, and pleasant and cooperative behavior. (Tr. 303-304). Gabriele observed that Brooks's mood was upbeat throughout the appointment. (Tr. 305).

On September 10, 2021, Brooks saw Brimus. (Tr. 307). Brimus noted that Brooks had increased depression, anxiety, and paranoia; had racing, blocked, and circumstantial thought processes; and tangential behavior. (Tr. 307-308). Brooks reported that "Life's problems are my limit," and a continued inability to sleep and daily alcohol to cope. (Tr. 309). Brooks related his personal problems to his substance use. *Id.* Brimus noted Brooks expressed being in crisis and displayed poor insight into his alcohol use. *Id.*

9

On September 15, and 24, 2021, Brooks saw Brimus.  (Tr. 314, 317).  On September 15, Brimus noted that Brooks had an anxious mood, blocked through process, and tangential behavior, but by September 24, Brooks's mood had improved, and he had a loose thought process.  *Id.*  During their September 15 session, Brooks reported that his symptoms' severity had increased, expressing concerns about his memory.  (Tr. 316).  Brimus noted that Brooks was unable to identify the impact his alcohol use had on his memory.  *Id.*  During their September 24 session, Brooks reported continued anxiety and that he was discharged from the hospital the night prior after being admitted to detox.  (Tr. 319).  He reported being sober since then, having a clearer mind, and playing games on his phone.  *Id.*

On September 29, 2021, Brooks saw Gilbert.  (Tr. 320).  Gilbert noted that Brooks had not been in since June, and he continued to struggle with alcohol abuse.  *Id.*  Brooks reported that his mood fluctuated, noting depression, agitation, anxiety, and ongoing paranoid thoughts.  *Id.*  He also reported insomnia symptoms and that he was not taking his mood stabilizer consistently due to the paranoid thoughts.  *Id.*  Brooks indicated he drank four 24 oz. cans or a 6-pack of beer daily.  *Id.*  Gilbert observed that Brooks was receptive, cooperative, and hopeful, but was also easily confused, scattered, distracted, tangential, and had pressured speech.  *Id.*

In a mental status exam, Gilbert noted that Brooks's speech and language were within normal limits, and he had a sad, anxious, and irritable mood.  (Tr. 322).  Gilbert also observed that Brooks was fully oriented and distractible but had an anxious, irritable/angry, and congruent affect; a poor attention span; racing thought process; paranoid thought content; tangential associations; poor insight and judgment; and a normal fund of knowledge for his developmental level.  (Tr. 323-324).  Gilbert specifically assessed that Brook had a fair memory.  (Tr. 324).  Gilbert assessed Brooks with mixed mood symptoms (agitation, anxiety, and depression),

insomnia, and alcohol abuse.  (Tr. 324-325).  Gilbert instructed him to restart his medication and recommended psychotherapy.  (Tr. 326).

     **C.**     **Relevant Opinion Evidence**

On March 30, 2021, Jamie Lai, a psychologist, reviewed the medical evidence of Brooks's mental health conditions to determine if they caused any functional limitations. (Tr. 66-67).  As to his understanding and memory, Lai found that Brooks was moderately limited in his ability to remember locations and work-like procedures, and in his ability to understand and remember detailed instructions.  (Tr. 66).  As to his ability to sustain concentration and persistence, Lai found that Brooks was moderately limited in his abilities in the following areas: (i) carry out detailed instructions, (ii) maintain attention and concentration for extended periods, (iii) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, (iv) work in coordination with or in proximity to others without being distracted by them, (v) make simple work-related decisions, and (vi) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 66-67).  As to Brooks's social interactions, Lai also found that he was moderately limited across each area of functioning, except for a marked limitation in his ability to interact appropriately with the general public.  (Tr. 67).  Likewise, Lai concluded that Brooks had a moderate limitation across all areas of adaption.  *Id.*

On May 19, 2021, Leslie Rudy, Ph.D., reconsidered the medical evidence regarding Brooks's mental health limitations; Dr. Rudy largely affirmed Dr. Lai's findings.  (Tr. 75-77). However, as to Brooks's ability to sustain concentration and persist, Dr. Rudy concluded that Brooks was moderately limited in the same areas as Dr. Lai except for his ability to make simple

work-related decisions, in which Dr. Rudy concluded Brooks was not significantly limited. (Tr. 76).

### D. Relevant Testimonial Evidence

Brooks testified at the hearing. (Tr. 40-56). Brooks stated he lived alone in "mental permanent housing," where he could live for free so long as he cut the grass, worked, and paid about $50 a month. (Tr. 40). He did not have a valid license and would usually rely on his insurance or counselor to drive him or meet him at his home. (Tr. 41). He had completed the 10th grade. *Id.* Brooks could not remember when he last held a full-time job, stating "My mind goes in and out," but he indicated he had not worked in the last three months. *Id.* Brooks testified that his medication, although it made him stable, made him sleepy and unable to leave the house and he could not work because of his anxiety, paranoia, and depression. (Tr. 42). He lacked the energy to perform self-care, but he made sure to take his medication. (Tr. 43). One of his medications would make him stable but "I'll just sit on the couch like a dummy or a zombie." *Id.* If he did not take his pills, his mind was always racing. (Tr. 44). He would see his brother about every other day, but indicated he did not provide support, and he would see his child whenever his child's mother would bring the child around. (Tr. 44-45). He spent his time talking to his counselor or lawyer, or going to the counseling center. (Tr. 45). He did not use a computer, the internet, or any form of social media, stating "I've barely got a basic phone." (Tr. 46). He could count and make change, but, if he watched television, his mind would start racing and he could not tell what was going on. *Id.*

Brooks testified that, since February, his conditions had worsened. (Tr. 46-47). His conditions would be aggravated by his stress, anxiety, and paranoia, and they impacted his memory. (Tr. 47). His conditions also made him not like people. *Id.* He would make himself

microwavable meals and sandwiches because he did not trust himself not to fall asleep and burn the house down.  (Tr. 48).  He did other chores in his home.  (Tr. 49).  About twice a month, he would not take his medication and cut grass for money.  (Tr. 49-50).  He made about $30 a month from his mowing.  (Tr. 50).

As side-effects from his medication, Brooks testified that he would become numb, and have racing thoughts.  (Tr. 51).  He also had difficulty reading, but he took regular classes in school.  (Tr. 51-52).  He dropped out of school when his mother was murdered.  (Tr. 52).  He slept most of the day and, if he was not asleep, he would just be "in the zone."  (Tr. 53).  On days he needed to do something, he would skip his medication so he could "come out of that zone," but he still did not complete chores because he would be interrupted by his paranoia. (Tr. 53-54).  He testified that he went through a "little alcohol spree" when he went through his divorce.  (Tr. 54).  He could not remember whether it was the week or day prior that he had last drank.  (Tr. 54-55).  Brooks's attorney asked whether he noticed any difference when he did not drink alcohol, to which Brooks started to respond and then asked who he was talking to. (Tr. 55).  After clarification, Brooks said that sometimes the alcohol would cure his problems and sometimes it would make them worse.  *Id.*  His racing thoughts would get worse when he was drinking.  *Id.*  And he would still have problems talking to people when he was not drinking. *Id.*

## III.    Law & Analysis

### A.    Standard of Review

The court's review of the Commissioner's final decision denying disability benefits is limited to deciding "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence."  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d

399, 405 (6th Cir. 2009).  Substantial evidence exists "if a reasonable mind might accept the relevant evidence as adequate to support a conclusion," *id.* at 406 (internal quotation marks omitted), even if a preponderance of the evidence might support the opposite conclusion. *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020).  However, the ALJ's decision will not be upheld when the ALJ failed to apply proper legal standards and the legal error prejudiced the claimant. *Rabbers v. Comm'r SSA*, 582 F.3d 647, 654 (6th Cir. 2009).  Nor will the court uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotation marks omitted).

### B.    Step Three: Mental Health Listings

Brooks contends that the ALJ erred in finding that he had only a moderate limitation in his ability to concentrate, persist, and maintaining pace.  ECF Doc. 8 at 9-10.  Brooks asserts that the ALJ's reasoning in support of a moderate limitation was inaccurate and contrary to the evidence, rendering the finding unsupported by substantial evidence. *Id.* at 11-12.

The Commissioner disagrees.  ECF Doc. 9 at 4-7.  Relying on *Wamsley v. Comm'r*, No. 5:18-CV-0269, 2018 U.S. Dist. LEXIS 221256, at *5-6 (N.D. Ohio Nov. 14, 2018), the Commissioner contends that the ALJ's position was supported by substantial evidence, namely, the state agency consultants' opinions and the lack of contrary medical opinions. *Id.*

Brooks's reply brief largely reiterates his arguments, but contends *Wamsley* is distinguishable because the ALJ did not fully accept the state agency consultants' opinions. *See generally* ECF Doc. 10.

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in

14

20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all of the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). "A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641-42 (6th Cir. 2013)). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Listings 12.04, 12.06, and 12.15 all establish criteria for mental health related impairments, addressing affective disorders, anxiety-related disorders, and trauma- and stress-related disorders, respectively. 20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.15. To meet the Listings' severity level for any of the disorders, the claimant must show that he meets:

(1) the impairment-specific medical criteria in Paragraph A; and (2) the functional limitations criteria in Paragraphs B or C.  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04, 12.06, 12.15.

Brooks only challenges the ALJ's findings under Paragraph B, which requires the claimant to show that his disorder resulted in an "extreme limitation of one or marked limitation of two, of the following areas of mental functioning: (1) understand, remember or apply information; (2) interact with others; (3) concentrate, persist or maintain pace; (4) adapt or manage oneself."  20 C.F.R. pt. 404, Subpt. P, App. 1 §§ 12.04(B), 12.06(B); 12.15(B).

Although the ALJ's explanation of his reasoning leaves much to be desired, because substantial evidence supports the ALJ's conclusion, any error in the ALJ's reasoning was harmless.  Brooks's challenge focuses only upon two sentences from the ALJ's findings:

> **The claimant has moderate difficulties in concentrating, persisting, or maintaining pace.**  The claimant contended that he has limitations in concentrating generally and avoiding distractions.  On the other hand, the claimant said that he is also able to prepare meals, watch TV, and play games.  Additionally, the record fails to show an inability to complete testing that assess concentration and attention.

(Tr. 19 (emphasis in original)).  The ALJ's reasoning is questionable at best.  When looked at in context, Brooks's testimony points to his limitations.  Brooks testified that he microwaved meals or made sandwiches – specifically because he was afraid he would fall asleep and start a fire if he cooked other things.  (Tr. 48).  In other cases, the court has noted that it is preposterous to cite watching television to support a finding about an individual's ability to concentrate.  *See Fauvie v. Comm'r of Soc. Sec.*, No. 4:20-CV-2750, 2022 U.S. Dist. LEXIS 87956, at *37-38 (N.D. Ohio Mar. 15, 2022) *adopted* 2022 U.S. Dist. LEXIS 122213 (N.D. Ohio Jul. 11, 2022).  And it is even more so here, when Brooks testified that he does not even own a television.  (Tr. 46).  Moreover, the ALJ's reference to testing is misleading.  Rather than simply stating that the record lacked objective evidence to show Brooks had limitations, the ALJ concluded that the

16

lack of testing showed – not that Brooks had limitations – but that Brooks was unable to *complete* the testing, which undermined his claimed limitation. This reasoning is not only confusing and unclear, but also appears to miss the core issue, because Brooks's "inability" to complete testing may or may not (depending on the circumstances) actually show he had a limitation in his concentration. And the lack of such testing should not be interpreted to provide a definitive position on Brooks's abilities, in light of the role varying circumstance could play.

Despite the ALJ's confusing choice of words and questionable conclusions, an affirmance is nevertheless warranted based on the substantial evidence that supports the ALJ's conclusion. Brooks does not contest the ALJ's statements that he could play games on his phone or that there was a lack of evidence on Brooks's inability to complete assessments of his concentration and attention. *See* ECF Doc. 8. Rather, he asks the court to find that those reasons were insufficient in light of the other evidence. This would require the court to reweigh the evidence. This we cannot do. *See Jones*, 336 F.3d 469, 476 (6th Cir. 2003) (holding that under the substantial evidence standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence).

Additionally, the ALJ recognized that there were no treating or examining physician opinions indicating that Brooks's condition met a listed mental health impairment. (Tr. 18). The ALJ also noted his consideration of the state agency consultants' opinions, both of whom found that Brooks had only moderate limitations or was not significantly limited in his ability to concentrate, persist, and maintain pace. *Id.* State agency consultants' opinions are substantial evidence sufficient to support the ALJ's Step Three finding. *See Eiland v. Astrue*, No. 1:10-CV-2436, 2012 U.S. Dist. LEXIS 12864, at *25-28 (N.D. Ohio Feb. 2, 2012) (noting the state agency psychologists support for the ALJ's listings conclusion in affirming the ALJ's decision);

*Wamsley*, 2018 U.S. Dist. LEXIS 221256, at *5-6 (affirming the ALJ's "substandard" listings analysis because the ALJ referenced the lack of other medical opinions on the subject and was supported by the state agency consultants).

Brooks contends that the ALJ "implicitly acknowledged that the state agency consultants did not accurately assess Plaintiff's functional limitations" by disagreeing with the state agency consultants' finding of moderate limitations in Brooks's ability to interact with others. ECF Doc. 10 at 1. But – the ALJ explained his disagreement with the state agency consultants stating they were persuasive, but that he added additional limitations based on Brooks's most recent treatment. (Tr. 25). Even more importantly, however, the ALJ agreed with the state agency consultants' findings as to Brooks's ability to concentrate, persist, and maintain pace. Brooks's assertion that the ALJ made an implicit finding mischaracterizes the ALJ decision. As a result, the ALJ's citation to Brook's ability to play games and the lack of objective testing, in addition to the substantial evidence otherwise supporting the ALJ's findings, renders any errors in the ALJ's reasoning harmless. *See Kobetic v. Comm'r of Soc. Sec.*, 114 Fed. App'x. 171, 173 (6th Cir. 2004) (holding that the court does not remand when it "would be an idle and useless formality") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)). Thus, the ALJ's decision is due to be affirmed.

## IV.    Recommendation

Because the ALJ's findings regarding the mental health listings was supported by substantial evidence, the Commissioner's final decision denying Brooks's application for SSI is affirmed.

Dated: July 12, 2023

Thomas M. Parker
United States Magistrate Judge

18

**Objections, Review, and Appeal**

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C. § 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, *6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).